W. Clark Wise and Honora Wise v. Commissioner.
Wise v. Commissioner
Docket No. 55815.
United States Tax Court
T.C. Memo 1957-83; 1957 Tax Ct. Memo LEXIS 169; 16 T.C.M. (CCH) 361; T.C.M. (RIA) 57083; May 23, 1957
Thomas F. Callahan, Esq., Hanna Building, Cleveland, Ohio, and Ira W. Patterson, Esq., for the petitioners. Maurice B. Townsend, Jr., Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: An income tax deficiency for the taxable year 1950 has been determined by the Commissioner against petitioners in the amount of $1,530.78. The issues for decision are (1) whether petitioner W. Clark Wise sustained a deductible net loss from harness racing of horses and (2) whether he sustained a deductible net loss from the operation of a farm during that year. General Findings of Fact Such facts as have been stipulated are so found. Petitioners, W. Clark and Honora Wise, husband and wife, filed joint Federal income tax returns for the year 1950 with the collector of internal revenue for the *170 18th district of Ohio at Cleveland, Ohio. Inasmuch as the activities of W. Clark Wise are those with which we are here primarily concerned, "petitioner" as hereinafter used has reference to him. Petitioner is 77 years old and has been interested as part owner in an automobile agency for many years, since 1933, and was so interested during the year 1950. This activity occupied substantially all of his time, and he received income therefrom in the amount of $21,079.23 during the year 1950. Findings of Fact Issue 1 Since his youth petitioner has been interested in working, breeding, racing and dealing in horses. Beginning in 1947 and continuing through 1955 petitioner held a half interest in the following harness racing horses whose costs, winnings, depreciation and expense, and gain or loss from the owning and racing of which appear opposite their respective names: Deprecia-
Name of
tion and
Gain
Year
Horse
Cost
Winnings
Expenses
or Loss
1947
Magnolia
$2,400.00
Baldwin
1,250.00
Guy Kuno
750.00
$1,724.16
$3,383.50
($1,659.34)
1948
Magnolia
Baldwin
Guy Kuno
3,528.27
5,753.85
( 2,495.58)
1949
Baldwin
Guy Kuno
Brooklawn
600.00
1,227.70
3,382.90
( 2,155.20)
1950
Baldwin
938.19
Brooklawn
525.41
Guy Kuno
877.91
Margo Abbey
(Sold in 1950, Cap. Gain 517.50
LaBelle Abbey
(Sold in 1950, Cap. Gain 202.50-720.00 [1]
Wise Paul
110.00
Clever Mack
750.00
2,341.51
5,477.23
( 3,135.72)
1951
Baldwin
Buy Kuno
Brooklawn
Clever Mac
Nora Vola
1,250.00
3,781.99
5,676.67
( 1,894.68)
1952
Baldwin
Guy Kuno
Clever Mac
Darn Trusty
1,187.50
Sidney Holmes
175.00
2,900.06
5,853.84
( 2,953.78)
1953
Clever Mac
Darn Trusty
Sidney Holmes
What's Up
1,000.00
2,594.25
3,142.32
( 548.07)
Wise Paul
1954
What's Up
Wise Paul
Darn Trusty
5,078.65
5,112.10
( 33.55)
1955
What's Up
5,742.43
4,181.50
Worthy Maid
1,500.00
381.45
Darn Trusty
234.50
763.54
Wise Paul
117.54
Total
$5,976.93
$5,417.03
$ 559.90
*171 Although petitioner kept no formal books of account with respect to the horse racing operation until such books were prepared by an accountant during 1950, he did keep sufficient basic records of his income, cost, and expense so that his profit or loss could be determined at any time. During the year 1950 it was necessary for petitioner to attend substantially all the races in which his horses were entered because the trainer and driver were somewhat addicted to intoxicating liquors and it was necessary for him to see that the horse was in condition to race, that he was ready to race, and that the handlers were in proper condition. An additional reason for petitioner's attendance at the various races was the prospect of meeting people who would be interested in buying one of his horses. In addition, when the distance from the place where the horses were quartered to the track was relatively short, petitioner would transport the horses in his own trailer or small truck. On the other hand, if the distance *172 was substantial, he would engage truckers to perform that work. During the non-racing season petitioner's horses were kept at the Stark County Fair Grounds in Canton, Ohio. The cost for the use of those facilities to petitioner during the non-racing season was low, the barn rent being only $12 a month. During the time the horses were kept at the fair ground in the non-racing season, they required substantial attention and petitioner made daily visits there in order to see that proper care was being given them. Although petitioner intended to profit by horse racing and the sale of race horses during 1950, he would have engaged in the activity as he had in years prior and since whether or not profit was forthcoming. Petitioner was not engaged in the racing and dealing in horses during 1950 as a business operation primarily for profit, but as a hobby. Opinion Issue 1 Whether or not petitioner intended to and did race and deal in horses during 1950 primarily for profit so that his activities may be said to constitute a business is the crux of this issue. We are convinced from petitioner's life-long interest in horses and racing, from his testimony, and from a long and largely *173 consistent record of his net losses that he has engaged in the past and did in 1950 and in subsequent years engage in owning, racing, and dealing in harness racing horses whether or not he made a gain or suffered a loss from the operation. A comparison of his conduct of that operation with the successful and profitable operation of his automobile sales agency confirms this conclusion. His intent and desire to make a profit were entirely secondary to the gratification of his desire to remain active in an activity with which he had been allied all his life. His horse racing and dealing constituted a hobby rather than a business. The expenses thereof which result in the net losses here sought to be deducted cannot therefore be said to be the ordinary and necessary expense of carrying on a trade or business under section 23 of the Internal Revenue Code of 1939. The Commissioner has properly disallowed this loss deduction. Findings of Fact Issue 2 Petitioner was born and reared on a farm and, with his brother, rented and operated a 500-acre farm for several years after leaving the farm of his parents. Thereafter, he successively entered and after a period of operation left the dairy *174 and road construction contracting businesses. Since 1933 petitioner has been part owner and active in the operation of an automobile sales agency from which he has derived virtually all of his income and to which business the major proportion of his life was devoted during subsequent years, including 1950. In June of 1948 he purchased a farm, consisting of about 42 acres of tillable ground, upon which there were a house, a barn, and miscellaneous farm buildings. The purchase price was $10,000. At the time of its purchase, the farm was in a run-down condition so far as its use for farming was concerned. The house and barn, although generally in good condition, were in need of some repair. Petitioner remodeled the house and rented it. He reroofed the barn and painted it and the outbuildings. He repaired fences and, in 1949, began fertilizing the soil in an effort to bring it to its full crop-producing capacity. During that year he purchased a tractor, a farm truck, and a mowing machine at a total cost of $1,420, fertilizer at a cost of $195.49, and seed at a cost of $140.62. He planted wheat, corn, and oats during that year and purchased and sold cattle, upon which latter transactions *175 he reported income of $518.09. In 1950 petitioner purchased a side rake and manure spreader at a cost of $100, a wagon at a cost of $150, and a hay loader at a cost of $20. He also expended $404.26 for lime and fertilizer and approximately $62 for seed and reported a gross income of $529.90. The following schedule shows the farm income and expenses for the years 1949 and 1950: Items
1949
1950
Income: Sale of cattle
$518.09
$ 129.70
Sale of grain
71.40
161.20
Produce consumed
100.00
100.00
Sale of chickens
39.00
Gas lease
100.00
Total
$689.49
$ 529.90
Expenses: Seed and plants
$140.62
$ 62.30
Repairs and maintenance
210.00
124.20
Fertilizer and lime
195.49
404.26
Veterinary
18.00
15.00
Taxes
29.65
68.92
Insurance
49.65
43.47
Depreciation
308.85
657.50
Labor
457.06
Feed
4.00
Machine hire
62.54
Gasoline
91.66
Freight
10.00
Auto upkeep
42.80
Total
$952.26
$2,043.71
The farm has never produced a profit. The gross income shown above includes 13 per cent of its produce which was consumed by petitioner's family and returned by him as income. The failure of the farm operation to show a profit is due *176 in large part to its size and the poor condition of its soil which has required petitioner to build up its productive capacity over a period of years. No recreational facilities exist on the farm and it has never been used by petitioner, his family, or friends for that purpose, except for occasional pheasant hunting by petitioner himself. He has consistently spent a regular portion of his time in farming activity and has, in each year of its operation, planted, cultivated, and harvested crops for sale over and above any amount of farm produce consumed by him. He has kept accurate records of account with respect to farm expense and income. Farm losses for 1954 and 1955 are sharply reduced from those of prior years. Although petitioner's farming activity has been at a loss since its inception in 1949, his purpose in engaging in that operation was primarily to rebuild the farm with the object of deriving a yearly profit therefrom. In 1950 he was carrying on a trade or business primarily for profit in operating his farm. Opinion Issue 2 It is true that evidence of consistent net loss in the conduct of a business operation is usually indicative of a hobby rather than the carrying *177 on of a trade or business primarily for profit, but where such losses may be attributed to the repair and build-up of a badly run-down business facility, the indication does not necessarily follow. It is satisfactorily shown that such is the case here. Petitioner has not treated his farm as a hobby, but has very apparently, even at an advanced age, spent a regular proportion of his time actually laboring physically upon the farm and generally supervising its operation. He has each year raised grain crops for sale and has derived gross income therefrom. He has kept accurate account of his income and expense. He has spent a considerable amount in providing machinery for the operation of the farm. It is clear that he has conducted the operation with an object to rehabilitate his farm for the purpose of bringing it eventually to the point where income will exceed the expense of doing business. Of significance is the fact that, except for occasional pheasant hunting, petitioner, his family, and friends have never used the farm for recreation. Indeed, it is clear that no facilities for such use of the property exist. It might, of course, be argued that petitioner in laboring on the farm *178 derives recreational enjoyment therefrom, but, if so, there would be no inconsistency with its operation as a business for profit for such is not uncommonly the case with respect to many businesses and their proprietors where there is no question but that the operation is a business and not a mere hobby. The Commissioner, on brief, argues at some length that the farm here involved could not have ever produced a profit because of its size. In so arguing he virtually asks that we take judicial notice that under the farm economy as it existed in 1950 and subsequent years 40-acre farms were not large enough to be profitably operated. We, of course, may not take judicial notice of such a fact and respondent has offered no evidence which would support it. We think petitioner, in the absence of contrary proof by respondent, has demonstrated that his farm will in due course show a profit and that his operation thereof during the taxable year 1950 was primarily the operation of a business to that end within the meaning of section 23(a)(1)(A) of the Code. Because no contention is made here that the farm expenses reported by petitioner are not reasonable, ordinary, and necessary, it follows *179 that petitioner's farm loss as reported in his income tax return for 1950 was properly taken. Decision will be entered under Rule 50. Footnotes
1. The $720 received on sale of petitioner's interest in Margo Abbey and LaBelle Abbey was reported on income tax return as capital gain, there being no basis as shown herein.↩